**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | |
|---|---|
| **CHRISTOPHER ADAMS,** )<br>    *Plaintiff,* )<br> )<br>**v.** )<br> )<br>**CORECIVIC OF TENNESSEE, LLC,** )<br>**as owner and operator of TROUSDALE** )   **Case No.:** _____<br>**TURNER CORRECTIONAL CENTER;** )<br>**DAMON HININGER; STEVE CONRY;** )<br>**VINCENT VANTELL; TARI CRAWFORD;** )<br>**TROUSDALE COUNTY, TENNESSEE;** )<br>**STATE OF TENNESSEE,DEPARTMENT** )<br>**OF CORRECTION; and TENNESSEE** )<br>**DEPARTMENT OF CORRECTION** )<br>**COMMISSIONER FRANK STRADA,** )<br>    *Defendants.* ) | |

---

### VERIFIED COMPLAINT

---

Plaintiff Christopher Adams, *pro se*, brings this action under provision of 42 U.S.C. § 1983 and 28 U.S.C. §1367(a), alleging a violation of United States Constitution Amendment Eight, Tennessee Constitution Article I § 32, and, under provision of Tennessee Code Annotated (T.C.A.) §1-3-121, alleging unconstitutional government action. For the Complaint, Plaintiff states to the Court:

### I. INTRODUCTION

1.      This action arises because of CoreCivic of Tennessee, LLC (CoreCivic), Damon Hininger, Steve Conry, Vincent Vantell, the State of Tennessee Department of Correction (TDOC), Trousdale County Tennessee (Trousdale County), and TDOC Commissioner Frank Strada's failure to provide reasonable personal safety to Plaintiff through adequate staffing at the Trousdale Turner Correctional Center (TTCC). And, because of TTCC Classification

1

Coordinator Tari Crawford and Commissioner Strada's refusal to transfer Plaintiff away from there because of such.

2.     The TTCC is owned and operated by CoreCivic (formerly Corrections Corporation of America). The TDOC contracts with CoreCivic through Trousdale County to house inmates committed to its custody under provision of state law. Plaintiff has been incarcerated at the TTCC since October 4, 2021, subject to CoreCivic's profit-motivated customs, practices, and/or policies (hereafter collectively "policies" or "policy"). Their understaffing policy has resulted in a long-standing and pervasive history of violence and the death of numerous inmates. CoreCivic, the TDOC, and Trousdale County, through their three-party contract are subjecting Plaintiff to unsafe conditions at the TTCC in violation of Const. Amend. Eight and Tenn. Const. Art. I § 32. In the event of inmate-on-inmate attacks, fire emergencies, or medical emergencies the TTCC is not adequately staffed to respond thereto. As a result, Plaintiff fears for his current and future safety due to the severe understaffing and the dangerous and volatile environment resulting from it.

3.     Although CoreCivic and the TTCC offer protective custody for those who fear for their safety, such provision is futile. The Alpha Unit at the TTCC is where inmates are housed for **protective custody**, administrative segregation, and punitive segregation. It should be the *safest* and *most secure* unit on the compound, but it is actually a ***killing ground*** where inmates are frequently subjected to inmate-on-inmate violence and death. At a minimum, inmates Joses Torres,[1] Terry Childress,[2] and Aaron Blayke Adams were all murdered while housed in the TTCC's Alpha Unit by their cellmate. Mr. Adams was housed therein on ***protective custody***.[3]

---

1 *See e.g.,* EXHIBIT 1, *Torres et al. v. CoreCivic et al.*, No.: 3: 23-cv-00191 (M.D. Tenn., pending)
2 *See e.g.,* EXHIBIT 2, *Newby et al. v. CoreCivic et al.*, No.: 3:22-cv-00093 (M.D. Tenn. 2022)
3 *See e.g.,* EXHIBIT 16, Telephone Interview, Daniel Horwitz Interviewing Treyton Lattimore (*Lattimore Interview*); *see also,* Chris Gregory, ***Family seeks answers in loved one's death at Trousdale prison***, available at: https://www.lebanondemocrat.com/hartsville/family-seeks-answers-in-loved-ones-death-at-trousdale-prison/article (January 2, 2021).

Plaintiff has a better chance at maintaining his own safety in general population where he can at least run from would be attackers as opposed to being locked in a cell with one he can not get away from. As a result, Plaintiff also fears for his future safety in the event he were to be housed in the TTCC's Alpha Unit.

4.      This Court is aware of and continues to be asked to adjudicate claims in relation to CoreCivic's chronic deliberate indifference to inmate safety;[4] it is aware of "inadequate medical staffing that was endemic of broader issues with staffing levels at CoreCivic facilities" in general, and of no less than one "inadequate medical emergency response in the case of an inmate who eventually died at the TTCC."[5] The Court also has knowledge of communications between CoreCivic's executives and lobbyists which establish CoreCivic's long-standing, wide-spread, and pervasive profit-motivated deliberate indifference to inmate safety.[6] The Court continues to have case after case after case brought before it that ultimately find their roots in the TTCC's lack of correction officers.

5.      In January 2020, the Tennessee Comptroller of the Treasury released a report that found a number of *repeated violations* concerning the TTCC which had been previously addressed in a 2017 audit. To wit, that "CoreCivic-managed correctional facilities operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts unstaffed;" that "CoreCivic staffing reports at [TTCC] and Hardeman County Correctional Facility contained numerous errors;" and that TTCC "management's noncompliance with contractual requirements and department policies relating to inmate services challenged the department's ability to effectively monitor the correctional

---

4   *See e.g. supra, Id.* nn. 1 and 2; and, EXHIBIT 3, First Amended Complaint, *Pleasant-Bey v. State of Tennessee, et al.,* No.: 3:19-cv-00486 (M.D. Tenn. 2020).

5   *See e.g.,* EXHIBIT 4, Memorandum, *Grae v. Corrections Corporation of America*, No.: 3:16-cv-02267 (M.D. Tenn. March 26, 2019) p. 6; *see esp.,* D.E. 57 ¶ ¶ 4 and 117.

6   *See, Grae Id.* at p. 7, n. 2 and *e.g.,* pp. 8-11; and D.E. 494.

facility."[7] This practice continues to this day.

6. Since beginning its operations of the TTCC CoreCivic has continued to fail in its constitutional duty to provide reasonable safety to the inmates in its care thereby exhibiting deliberate indifference to the same.[8] All of the problems that plague the TTCC are attributable to understaffing. The TTCC is unable to provide inmate services that promote positive behavior

---

7   *See,* Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (January 2020), available at: https://comptroller.tn.gov/content/dam/col/sa/advanced-search/2020/pal9032.pdf, (hereafter collectively "2020 Comptroller Report"), pp. 9 and 124; and Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (November 2017) (hereafter collectively "2017 Comptroller Report"), available at: https://comptroller.tn.gov/content/dam/col/sa/advanced-search/2017 p. 7.

8   *See,* Evan Mealins, *Lawsuit: CoreCivic's inaction led to inmate's killing* THE TENNESSEAN (May 2023) , https://www.tennessean.com/story/news/2023/05/ lawsuit-corecivic's-inaction-led-to-inmate's-killing; Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison*, WSMV (October 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article a4e670ea-78be-5087-85e5-a65ecd485475.html; Joseph Wenzel, *Over 1,200 staff, inmates test positive for COVID-19 at TTCC Turner Correctional Center*, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-TTCC-turnercorrectional-center/article_568c03d2-8bde-11ea-a447-4b7eaabeb67b.html; Adam Tamburin, *Tennessee prison inmate dies after fight at TTCC Turner*, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fightTTCC-turner-correctional-center/4581013002/; Dave Boucher, *New Tennessee CCA prison stops taking inmates amid 'serious issues*,' THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stopstaking-inmates/84867834/; Chris Conte, *Prisons for profit: Concerns mount about TTCC Turner Correctional Center, operator CoreCivic*, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-TTCC-turnercorrectional-center-operator-corecivic; Staff Report, *Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails*, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-forstaffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, *CoreCivic shareholders granted class action status in fraud lawsuit*, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securities-fraudlawsuit/3289913002/; Chris Gregory, *Family seeks answers in loved one's death at TTCC prison*, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answersin-loved-ones-death-at-TTCC-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, *Inmates at CoreCivic prisons say they sometimes go months without medical care*, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-gomonths-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, *Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees,* PLN (Jun. 7, 2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-deathreported-corecivic-employees/; Staff Report, *Private prison company CoreCivic's history of problems in Tennessee,* THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problemstennessee/4470277002/; Stephen Elliott, *State audit criticizes CoreCivic facilities*, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/stateaudit-criticizes-corecivic-facilities; Matt Blois, *CoreCivic reports $25M in profits as COVID infects 2,500+ inmates*, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prisonmanagement/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, *Problems Persist at Tennessee's Mismanaged Prisons*, THE NASHVILLE SCENE (Jan. 22,2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennesseesmismanaged-prisons; Dave Boucher, *CoreCivic investigating ex-officer's allegations of negligent deaths at private prison*, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-

such as, recreation, education, programming, religious services, adequate grievance procedures, adequate legal and leisure library access, adequate mail service, etc. because of understaffing. The lack of correctional services due to the understaffing results in the idleness of inmates, which in turn, has lead to excessive violence resulting in constant lockdowns further exacerbating the violence. For 2023, the TTCC has been on lockdown, or what is the equivalent

investigating-ex-officers-allegationsnegligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, *'Just Let Him Kick,'* THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, *Murfreesboro man charged in prison cellmate's death at TTCC*, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prisoncell-mate-ernest-hill-TTCC-turner/4818354002/; Ethan Illers, *Man killed during inmate-on-inmate altercation at TTCC Turner prison*, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/mankilled-during-inmate-on-inmate-altercation-at-TTCC-turner-prison/article_8d8b6806-9066-11e9b749-7b44cac1c002.html; Jeremy Finley, *Recorded conversations reveal life inside prison ravaged by COVID-19*, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversationsreveal-life-inside-prison-ravaged-by-covid-19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, *Gang activity, security a concern at TTCC Turner facility*, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-TTCC-turner-facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, *Tennessee's Largest Prison Still Appears as Troubled as Ever*, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-stillappears-as-troubled-as-ever; Jessie Williams, *TTCC Turner Corrections Officer Arrested*, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-TTCCturner-corrections-officer-arrested; Brett Kelman, *At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'*, THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulinTTCC-turner/925297002/; Natalie Allison, *Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility*, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicidecorecivic-prison/2355556002/; Dave Boucher, *Private prison chief: 'We've got work to do' at TTCC facility*, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/privateprison-chief-weve-got-work-do-TTCC-facility/95223230/; Demetria Kalodimos, *Former chaplain describes conditions inside TN prison*, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/formerchaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-5101-b11f-b5fd9270bf18.html; Chris Gregory, *TTCC Turner employee charged with smuggling contraband*, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/TTCC-turner-employee-charged-withsmuggling-contraband/article_6b865daf-fbc8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, *Prison corrections officer in TTCC County arrested carrying drugs*, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-TTCC-county-arrested-carrying-drugs/; Dave Boucher, *Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds*, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-bycorecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, *'This is unreal': Family seeks answers in death of TTCC Turner prison inmate*, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/TTCC-turner-inmate-aaron-blaykeadams-dead-family-wants-answers/4290646001/; Alex Corradetti, *Investigation underway following death of inmate at TTCC Turner Correctional Center*, WKRN (Sep. 8, 2021), https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-TTCC-turnercorrectional-center/; Chris Gregory, *Former TTCC Turner corrections officer indicted*, LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-TTCC-turnercorrections-officer-indicted/article_aac20d8d-16c5-5edc-9e7e-d5fd9f8bfd0e.html; Levi Ismail, *NAACP calls for closure of TTCC Turner Correctional Center, cites 'barbaric treatment' of Black men*, WTVF (Nov. 11, 2021),

of lockdown, for over 125 days further adding fuel to the fire, and therefore, Plaintiff's plight. As such, CoreCivic's understaffing policy creates a dangerous and volatile environment based on the *totality of the conditions* resulting from it.

7. Because of the lack of meaningful regulatory action in relation to their unlawful business policies CoreCivic is emblazoned by the knowledge that it can continue to operate with impunity. They continue to act with deliberate indifference to inmate safety despite their knowledge of the egregious and barbaric conditions at their facilities. Conditions where inmates are needlessly murdered, assaulted, robbed, raped, or extorted.[9] CoreCivic has no fear of repercussions for their actions, or in substance, lack thereof. They have yet to experience any significant and meaningful legal consequences for their conduct leaving them to believe they are above the law. CoreCivic continues to do business as usual because it knows that the TDOC has no choice but to house inmates at CoreCivic facilities due to the volume of inmates committed to the TDOC's custody.

8. In light of the Comptroller's report and the constant barrage of negative media coverage, in conjunction with other reports received by the TDOC and Commissioner Strada, state officials have actual knowledge that the TTCC is chronically and dangerously understaffed.[10] Despite having this knowledge the TDOC and Commissioner Strada have not sent correction officers to the TTCC to partially take over and ensure that *critical posts* are filled to accord reasonable safety and emergency responses.

9. Thus far, the TDOC has been unable to cure CoreCivic's staffing deficiencies at the TTCC through assessing liquidated damages against them in breach of their contract. It is

---

https://www.newschannel5.com/news/naacp-calls-for-closure-of-TTCC-turnercorrectional-center-cites-barbaric-treatment-of-black-men.

9 *See e.g., collectively*, EXHIBITS 12-15, which are Declarations from Mike Boldin, Joseph Miller, Kevin Dunn, and Jimmy Conaser, who are inmates currently, or were formerly, housed at the TTCC; and EXHIBITS 1-4.

10 2020 Comptroller Report p. 18

more profitable for CoreCivic to pay liquidated damages to the TDOC in breach of their contract for not filling *critical posts* than it is to fill the positions.[11] In addition to state regulators' inability to control CoreCivic's operation of the chronically unsafe TTCC, this Court has also been unable to compel them to remedy the violations. Time and time again CoreCivic races to settle claims and avoid a judgment being entered against them because settling a few lawsuits is cheaper than staffing prisons.

10.     Plaintiff has expressed his concerns to TTCC and TDOC officials on multiple occasions requesting a transfer back to a safe TDOC operated facility. Despite Plaintiff's concerns and the officials' actual knowledge demonstrated herein they are deliberately indifferent to Plaintiff's predicament because they refuse to transfer him even though they have the power to do so.[12]

## II. PARTIES

11.     Plaintiff **CHRISTOPHER ADAMS** is a TDOC inmate incarcerated at the TTCC, 140 Macon Way, Hartsville, Tennessee 37074.

12.     Defendant **CORECIVIC** is a Maryland corporation headquartered in Tennessee. Its principal place of business is 10 Burton Hills Boulevard, Nashville, Tennessee. It operates the TTCC and other Tennessee facilities under the full authority of the State of Tennessee pursuant to T.C.A. §§ 41-24-101 *et seq.* and/or 41-8-101 *et seq.* At times relevant to Plaintiff's Complaint, CoreCivic was acting under color of state law in the performance of a public function traditionally reserved to the state. CoreCivic is operating the TTCC as an instrumentality of the TDOC/State of Tennessee in performing the TDOC's duty to house individuals serving state sentences. CoreCivic is responsible for the implementation of policies, procedures, practices,

---

11 2020 Comptroller's Report, pp. 128 and *e.g.* 131-48.
12 *See e.g., collectively,* EXHIBIT 6 pp. 1 and 5, and EXHIBIT 7, pp. 1-3, which are true and accurate copies of what they represent.

and customs, as well as the acts and omissions challenged by this action. CoreCivic is licensed to do business in Tennessee and may be served through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, TN 37919.

13.     Defendant **DAMON HININGER** is the Chief Executive Officer of CoreCivic. Mr. Hininger's commitment to prioritizing shareholder profit over inmate safety has given rise to the chronically unconstitutional understaffing conditions that result in a lack of reasonable personal safety and the preventable deaths of inmates. Plaintiff's fear for his current and future safety is directly attributable to Mr. Hininger's failed oversight and calculated, profit-motivated understaffing decisions. Defendant Damon Hininger is an employee of CoreCivic acting under color of state law. Defendant Hininger may be served at his residence or wherever he may be found. ***Defendant Hininger is sued in his personal capacity.***

14.     Defendant **STEVE CONRY** is CoreCivic's Vice President of Operations Administration. Mr. Conry is the primary individual responsible for ensuring that CoreCivic's facilities are adequately staffed and that staff are properly trained and supervised. Plaintiff's fear for his current and future safety is directly attributable to Mr. Conry's failed oversight and calculated, profit-motivated understaffing decisions. At times relevant to this action Defendant Steve Conry is an employee of CoreCivic acting under color of state law. Defendant Conry may be served at his residence or wherever he may be found. ***Defendant Conry is sued in his personal capacity.***

15.     Defendant **VINCENT VANTELL** is the Warden of the TTCC. As the TTCC's day-to-day overseer Mr. Vantell is responsible for supervising its staff—including employees who are responsible for maintaining adequate staffing. Plaintiff's fear for his current and future safety is directly attributable to Mr. Vantell's deliberate indifference to the TTCC's chronically unconstitutional understaffing and misclassification conditions. At times relevant to this action

8

Defendant Vantell is an employee of CoreCivic acting under color of state law. Defendant Vantell may be served at his residence or wherever he may be found. ***Defendant Vantell is sued in his personal capacity.***

16. Defendant **TARI CRAWFORD** is the Classification Coordinator for the TTCC. She is the primary person responsible for the classification of inmates at the TTCC, which includes transfers. Plaintiff's fear for his current and future safety is directly attributed to Ms. Crawford's refusal to transfer Plaintiff to a TDOC operated facility as requested. Due to her presence on the TTCC's compound she has actual knowledge of the TTCC's severe understaffing and the dangers relating thereto. At times relevant to this action Defendant Tari Crawford is an employee of CoreCivic acting under color of state law. She may be served at her residence or wherever she may be found. ***Defendant Crawford is sued in her personal capacity.***

17. Defendant **TROUSDALE COUNTY** is duly incorporated under the laws of the State of Tennessee. Trousdale County contracts with the TDOC as the primary contractor to house inmates at the TTCC under provisions of T.C.A. §§ 41-8-101 *et seq.* and 41-24-101 *et seq.* Trousdale County has a lawful duty under the terms of their contract with the TDOC to ensure that CoreCivic performs all of the obligations set forth therein. At times relevant to this action Trousdale County was acting under color of state law. Trousdale County may be served through Trousdale County Attorney Branden Bellar, 206D Main Street, Hartsville, Tennessee 37074, or wherever he may be found. ***Trousdale County is sued solely for declaratory and prospective injunctive relief.***

18. Defendant **STATE OF TENNESSEE, DEPARTMENT OF CORRECTION** is a department of the State of Tennessee that is responsible for housing individuals serving state sentences of incarceration. To perform this government function, the TDOC contracts with CoreCivic through Trousdale County to operate the TTCC. In delegating these functions the

9

TDOC, through Trousdale County, contractually entrusts CoreCivic to operate as an instrumentality of the State of Tennessee. As Plaintiff's lawful custodian the TDOC has a legal duty to ensure Plaintiff is provided with a safe prison to serve his term of incarceration. The TDOC may be served through Tennessee Attorney General Jonathan Skrmetti, 500 Dr. Martin Luther King Blvd., Nashville, Tennessee 37202, or wherever he may be found. *The TDOC is sued solely for declaratory and prospective injunctive relief.*

19.     Defendant **FRANK STRADA** is the Commissioner of the Tennessee Department of Correction. Mr. Strada is responsible for the care of inmates committed to the departments custody to serve sentences for criminal convictions. State law charges Commissioner Strada with a duty to govern and manage the TDOC. T.C.A. §§ 4-3-602 and 4-3-603. Commissioner Strada has a legal duty as the Chief Executive Officer of the TDOC to ensure Plaintiff is provided with a safe prison to serve his term of incarceration. At times relevant Commissioner Strada was acting under color of state law. Commissioner Strada may be served at 320 6th Ave. N., Nashville, Tennessee 37243, or wherever he may be found. *Commissioner Strada is sued solely in his official capacity for declaratory and prospective injunctive relief.*

### III. JURISDICTION, VENUE, AND AUTHORITY

20.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1334.

21.     This Court has supplemental jurisdiction to adjudicate Plaintiff 's state law claims in relation to his federal claims pursuant to 28 U.S.C. § 1367(a).

22.     The United States District Court for the Middle District of Tennessee is the judicial district where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred. Accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). In addition, venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

**23.** This Court has jurisdiction to grant declaratory relief in relation hereto pursuant to 28 U.S.C. §§ 2201, 2202, and Federal Rule of Civil Procedures 57.

**24.** This Court has jurisdiction to grant damages and injunctive relief in relation hereto pursuant 28 U.S.C. § 1343 and Federal Rule of Civil Procedures 65.

## IV. FACTUAL ALLEGATIONS

**25.** Plaintiff incorporates and re-alleges the foregoing numbered paragraphs as if fully alleged and set forth in this section.

**26.** Commissioner Frank Strada is the Chief Executive Officer of the TDOC who is responsible for the custody, care, and safety of Plaintiff. T.C.A. §4-3-603(a). He has a duty to contract with local governments to house inmates committed to his care when the State's prisons are overcrowded. T.C.A. §§ 41-8-104(c) and 4-3-603(b). When so doing he has a lawful duty to monitor said contracts. T.C.A. § 41-24-109. The TDOC contracts with Trousdale County under provision of the County Correctional Incentives Act of 1981, T.C.A. § 41-8-101 *et seq.*, who in turn contracts with CoreCivic to house inmates sentenced to the TDOC. Ultimately, through all of the contractual jargon the parties agree to house inmates at the TTCC in full compliance with the United States Constitution, the Tennessee Constitution, state and federal laws and regulations, and the TDOC's policies. In the contract, TDOC expressly acknowledges and acquiesces to Trousdale County subcontracting with CoreCivic to house inmates at the TTCC. Even so, the TDOC still holds Trousdale County responsible for the performance of the terms and conditions of the contract, which Trousdale County in turn promises the TDOC that it will enforce.[13] State law also charges the Commissioner with a duty to visit prisons and ensure that

---

13 *See,* EXHIBIT 19 p. 49, Contract Between the State of Tennessee, Department of Correction and Trousdale County, Tennessee (hereafter "Contract") p. 50 § D.5(a) *Subcontracting* (Appendices not included). ("It is acknowledged and agreed by the State and [Trousdale County] that the duties and the obligations of [Trousdale County] hereunder may be performed in whole and/or in part from time to time by subcontractors. Any performance by a subcontractor shall constitute and be deemed performance by [Trousdale County] hereunder, provided, however, performance by a subcontractor shall not release [Trousdale County] of its obligation hereunder. [Trousdale County] is utilizing CoreCivic for the management and operation of the prison.").

"the laws, rules and regulations relative to the operation and maintenance of the penitentiary are duly observed." T.C.A. §41-1-106.

27. The TTCC is capable of housing over 2,500 inmates.

28. CoreCivic currently receives no less then $75.48 for each day they house an inmate at the TTCC.[14] This money is allocated for, *inter alia,* the provision of reasonable personal safety through adequate staffing of the prison.

29. As long as the TDOC continues to contract with CoreCivic, directly or indirectly through a three-party contract, Plaintiff is subject to remain at or be returned to a understaffed CoreCivic operated facility. *See,* T.C.A. §§ 41-1-103(2), 4-3-603(b), 41-24-103(d), and *e.g.,* 41-24-101*et seq.* and 41-8-101*et seq.*

30. On October 4, 2021, the TDOC transferred Plaintiff from the Bledsoe County Correctional Complex (BCCX) to the TTCC. Plaintiff did not request to be transferred.

31. Plaintiff has been a model minimum custody inmate for about twenty years. During Plaintiffs term of incarceration he has received no disciplinary convictions; does not have a security threat group affiliation; has earned two college degrees and two vocational certifications; has completed seven self-improvement programs/classes; served about eleven years on the board of an inmate organization called *The Lifers Club* doing philanthropic service; and, worked to help another inmate organization called the *Bledsoe County Veterans Organization* in their philanthropic service. In addition, as evinced by Plaintiff's non-existent disciplinaries, he has no history of violence while incarcerated. His most recent statutorily mandated risk needs assessment, T.C.A. § 41-1-126, ranks him at 0% for future aggression. Despite Plaintiff's impeccable institutional record the TDOC sent him to the *notorious killing grounds* of the TTCC.

---

14 EXHIBIT 19 p. 45, Contract p. 46.

32.     According to a 2020 Comptroller Report, the TDOC has positions that correction officers fill at each institution which are deemed *critical posts*. The report defined them as:

> *Critical posts* – facility management decides whether posts are critical and lists them in bold on the staffing rosters. **According to the [TDOC's] Policy 506.22, critical posts must be staffed regardless of institutional circumstances because leaving the posts unstaffed would jeopardize the security or safety of the facility, staff, inmates, or community.**[15]

Plaintiff restates the foregoing as his own allegation. According to the TDOC's policy leaving *critical posts* unstaffed creates a safety hazard to Plaintiff.

33.     Plaintiff has been housed at the TTCC since October 4, 2021, in the Whiskey Unit's Delta Pod. The Whiskey Unit has four 128 men open-bay barracks style pods that can house 512 inmates total. Based on Plaintiff's experience and knowledge through almost twenty years of incarceration, the Whiskey Unit should have a minimum of four correction officers, one for each pod that should be assigned inside the pod.

34.     During Plaintiff's time in TDOC operated facilities between January 15, 2004, through October 3, 2021, his housing unit/pod always had a correction officer on post. At the BCCX where Plaintiff has served most of his term of incarceration, there was a minimum of 1 correction officer posted for 108 inmates in the housing units. At all TDOC prisons that Plaintiff has been at, *critical posts* were always filled regardless of any circumstances.

35.     In July 2022, Plaintiff filed a grievance that was exhausted on September 12, 2022, relating to CoreCivic understaffing the TTCC. In said grievance CoreCivic officials acknowledged that the TTCC was understaffed and asserted that they had established a corrective plan of action to address Plaintiff's concerns. TDOC officials concurred with the TTCC officials' proposed plan.[16]

36.     On August 21, 2022, there was a correction officer posted inside of the Whiskey

---

15 2020 Comptroller Report p. 124 (emphasis added).
16 Attached hereto as EXHIBIT 8, Grievance # 355307, is a true and accurate copy of the grievance.

Unit Delta Pod where Plaintiff resides for all of first shift, and one posted in each of the other three Whiskey Unit Pods. When asked why she was posted inside the pod—because such was not normal for the TTCC—she replied that it was "because of a lawsuit."[17]

37.　In August of 2022, Plaintiff attempted to intervene under provision of Federal Rule of Civil Procedure 24 in, *Newby et al. v. CoreCivic et al.*, No.: 3:22-cv-00093 (M.D. Tenn. 2022) [D.E. 64 and 65], but it settled before he could get his foot in the door. It is Plaintiff's belief that this is the lawsuit that the correction officer was referring to as discussed above.

38.　The TTCC has not posted a correction officer inside the pod since late August/early September of 2022. Because the Whiskey Unit routinely operates with only 1 or 2 officers, in addition to not being in the pod, they rarely do security walk-thrus in Plaintiff's pod. At the TDOC prison Plaintiff was previously at the officers did a security walk-thru approximately every 30 minutes. Because of this plaintiff fears that no one will be available to assist him in the event of an inmate-on-inmate attack, and/or medical or fire emergency.

39.　At times, particularly when audits/inspections are conducted at the TTCC, CoreCivic has a group of correction officers called *temporary duty officers* (TDY's) who travel around filling positions at facilities that come to the TTCC during the same. When the audits are over Plaintiff usually no longer sees the new faces. One correction officer who filled a post briefly and then was gone confirmed this.[18]

40.　According to former TTCC Re-Entry Specialist Iuvina Basile`, in a warden's meeting the week of 9/26/2022, the TTCC "was more than $300,000 over budget for September" in part because of the expense from TDY's.[19] The TDY's were gone shortly thereafter. Plaintiff no longer saw the new faces.

---

17　Attached hereto as EXHIBIT 5 is a true and accurate copy of Christopher Adams' Personal TTCC Journal (*Adams' Journal*), p. 4 entry 8/21/2022.
18　*See also,* Exhibit 13, p. 2 ¶ 2 *Miller Declaration*.
19　EXHIBIT 5, *Adams' Journal*, p. 6, entry 10/1/2022 ** entry.

41.     In December 2022, Plaintiff once again filed a grievance relating to insufficient staffing at the TTCC that was exhausted in February 2023. In said grievance Plaintiff expressed fear for his safety because it appeared that the *single* correction officer assigned to the Whiskey Unit that day left the building on at least two occasions leaving the unit with no officer. Plaintiff saw her walk down the hall toward the entrance/exit of the building twice and watched for her to return. She was gone once for thirty minutes and once for forty-eight minutes. In said grievance TTCC officials acknowledged that they only have "1 or 2 officers assigned to the unit" at times who "have to be able to move around."[20] The TDOC concurred.

42.     Between April 16, 2022, through June 12, 2023, Plaintiff recorded in his personal journal about 260 days of TTCC operations, to include but not be limited to, staffing. During the aforementioned dates there were approximately 79 days where first shift had only 1 correction officer on post, approximately 82 days with only 2 correction officers on post for first shift, approximately 86 nights with only 1 correction officer on post for second shift, approximately 49 nights with only 2 correction officers on post for second shift, and several days and nights where 1 correction officer would work the Whiskey Unit and another Unit, thus leaving the Whiskey Unit with no correction officer at all for a time.

43.     Prior to October 4, 2021, CoreCivic had actual knowledge that the TTCC was understaffed and that *critical posts* were not being filled. They accepted Plaintiff at the TTCC anyway.[21]

44.     CoreCivic continues to routinely staff the TTCC with just 1 or 2 officers per unit even after the deaths of, *inter alios,* Aaron Blayke Adams, Terry Childress, Ernest Hill, Frank Lundy, and most recently, Jose Torres.

45.     In 2020, the Comptroller Report noted that the TTCC had 51 correction officer

---

20  Attached hereto as EXHIBIT 9 is a true and accurate copy of Grievance # 357697; *see* pp.7 and 8
21  *See e.g.,* EXHIBIT 16, Lattimore Interview pp. 30-31, lines 23-3.

posts on first shift and 36 on second shift. There are times when first shift does not even have 10 nor second shift 5 correction officers for the whole compound.[22]

46. It is Plaintiff's belief that CoreCivic counts new hire correction officer cadets who are not yet certified and still in training toward their required staffing pattern set by the TDOC. A large number of the cadets Plaintiff sees on the compound—TTCC trains on site—never even make it through training.

47. The TTCC has a high turnover rate for correction officers. In the 2020 Comptroller Report, the TTCC operated with a 78% turnover rate for 2018 and 25% in 2019. Indeed, all four CoreCivic-managed facilities had high turnover rates in 2018.[23] This frequent turnover rate continues at the TTCC to date. Because of this there are generally a lot of new inexperienced officers oftentimes working a unit by themselves or with another inexperienced officer. As a result, they are easily manipulated. Plaintiff routinely observes them letting inmates in and out of pods and buildings they do not live in. They will also frequently leave pod doors unsecured while complaining about being by their-self and having to run from pod to pod letting inmates in and out. Unfortunately, they will let an inmate into a pod or building with the wrong color identification wristband contrary to TDOC policy (Each unit is color-coded and inmates wear a corresponding colored wristband to identify that they live in the particular building or pod.).[24]

48. CoreCivic's chronic understaffing policy is not exclusive to the TTCC or its other Tennessee-based facilities. CoreCivic's understaffing policy is endemic everywhere that they operate including, *inter alios*, Idaho, Oklahoma, Mississippi, Kansas, and even the Federal

---

22 2020 Comptroller Report p. 132; and EXHIBIT 13 p. 2 *Boldin Declaration,* and EXHIBIT 5 p. 10 12/17/2022 entry, *Adams' Journal.*

23 2020 Comptroller Report p. 141.

24 *See,* TDOC Policy, 506.13, *Identification of Inmates* § VI (E), pp. 6 of 7, available at: https://www.tn.gov/correction/about-us/policies-and-procedures.html. *See also, infra* ¶¶ 79 and 91.

Bureau of Prisons (BOP).

49.     In 2011, the American Civil Liberties Union (ACLU) filed suit against CoreCivic regarding understaffing at their Idaho facility. The ACLU 's complaint alleged that CoreCivic's understaffing of the facility created a violent atmosphere. CoreCivic settled the lawsuit agreeing to provide the minimal number of correction officers required. In 2013, CoreCivic was held in contempt of court for violating the settlement agreement and *cooking the books* by falsifying records to misrepresent the actual number of correction officers working at the facility. In 2014, the Federal Bureau of Investigation (FBI) conducted an investigation regarding CoreCivic for billing the state for "ghost employees." Governor Butch Otter ordered state officials to take over operation of the facility. CoreCivic was required to reimburse the state $ 1 million for the understaffing.

50.     Sometime around February 23, 2017, CoreCivic was found by a jury to have violated the Idaho inmates' Eighth Amendment right to be free from cruel and unusual punishment. The jury found CoreCivic to be deliberately indifferent to the safety of the inmates because of the serious risk created by CoreCivic's long-standing practice of understaffing the Idaho prison.

51.     In yet another report released by the OIG, CoreCivic was found to be understaffing a United States Marshals detention facility in Leavenworth, Kansas. The Leavenworth facility maintained staff vacancy levels as high as twenty-three percent between 2014 and 2015. Prison regulations only permit two inmates per cell at the Leavenworth facility, but CoreCivic was caught trying to cover up the fact that it was housing three inmates in the two man cells. The April 25, 2017, OIG report set forth in pertinent part that:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth] Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees. LDC staff uninstalled the third beds bolted to the floor of several cells

17

designed for two detainees and removed the beds from the facility in advance of a 2011 American Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

52.     There was a riot at a Natches, Mississippi BOP facility operated by CoreCivic in March of 2012. Approximately twenty inmates and prison officials were injured and a guard was killed during the riot. In December of 2016, after the conclusion of an OIG investigation a report was released in relation thereto alleging that:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence system. The report specifically cited the lack of Spanish-speaking staff and staff experience.
>
> For years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correction and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at even lower levels than at the time of the riot in terms of actual post coverage. Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

Plaintiff restates the foregoing allegations as his own.

53.     At an Oklahoma prison operated by CoreCivic violence was rampant in as early as 2015. On February 25, 2015, ten inmates had an altercation that resulted in five of them receiving stab wounds. In March 2015, eight inmates participated in another stabbing incident. In June of 2015, thirty-three inmates fought with various weapons resulting in eleven inmates receiving medical care at a hospital. Four inmates were killed during a riot at the prison on September 12, 2015. Allegedly gangs were, in substance, being permitted to run the prison. The Oklahoma Department of Corrections conducted an investigation of the September 12, 2015, riot which resulted in a finding that evidence from three cameras at the prison were recorded over or deleted by CoreCivic's employees. CoreCivic housed a little over ten percent of Oklahoma's

prison population from 2012 through 2016, yet one-third of all prison homicides in the state occurred at the CoreCivic operated Oklahoma facility.

54. CoreCivic also understaffed other prisons where they housed BOP inmates. The Office of the Inspector General (OIG) found pervasive and widespread staffing deficiencies at BOP facilities operated by private prison contractors, to include CoreCivic.[25] Because of these findings the United States Department of Justice began to phase-out its use of private prison contractors. This phase-out led to the, *Grae v. Corr. Corp. of. Am.*, No. 3:16-cv-02267 (M.D. Tenn. March 26, 2019), shareholder case in this Court.

55. Periodically the State of Tennessee, Comptroller of the Treasury conducts audits of the TDOC under provision of the Tennessee Governmental Entity Review Law. T.C.A § 4-29-111. The resulting report is provided to, *inter alios*, the TDOC, the Commissioner, and the joint Government Operations Committee to review when determining whether the TDOC should be continued, restructured, or terminated.

56. In 2017, a Comptroller Report made specific findings related to the TTCC that were not in conformity with TDOC policy for security and safety. The following excerpts are from the report:

> Trousdale Turner Correctional Center and Whiteville Correctional Facility, managed by Core Civic, operated with fewer than approved correctional officer staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and one left critical posts unstaffed.

> Shortages in correctional officer staff may have prevented two Core Civic facilities (Trousdale Turner Correctional Center and Whiteville Correctional Facility) from meeting staffing obligations and may have limited their ability to effectively manage the inmate populations assigned to them. Correctional officer staffing was often less than operationally planned, and Trousdale Turner had unstaffed critical posts on several days. Both facilities had rosters that did not match state-approved staffing patterns, and both facilities were consistently short-staffed.

---

25 The findings were summarized in a video report made available by the United States Department of Justice. Multimedia available at: justice.gov, video date August 11, 2016.

Trousdale Turner operated with less than the number of security staff listed on the approved staffing pattern. Our analysis revealed instances of officers working consecutive shifts (16 hours in a row); critical and non-critical posts closed because officers were moved to cover other posts; and posts designated as closed on the roster with no staff assigned when the staffing pattern indicated the posts should be staffed. On April 1, 2017, Trousdale Turner management implemented a new staffing pattern that changed the number of critical posts and the number of shifts for security staff; however, the department did not approve the new plan until June 2017. The new staffing pattern changed certain security and unit management posts from three 8-hour shifts to two 12-hour shifts and reduced the total number of correctional officer staff needed to cover operations.[26]

**Facilities that fail to maintain consistent staffing levels of correctional officers can be limited in their ability to provide staff and inmates with a safe environment** and to meet inmate needs like recreation and transportation. A March 2017 article, "Impacts of Understaffing," published by the American Correctional Officer Intelligence Network, states, **"Staffing is arguably the most crucial element to safety inside our prisons"** and **"the total interaction between staff and inmates is what determines the level of safety within the facility."** Staffing rosters and staffing patterns are strong indicators of operational performance, and they should be analyzed routinely. **Not following approved staffing patterns can undermine the department's ability to provide a safe prison environment and to reduce recidivism. It can also lead to increased violence,** escapes, forced overtime, staff sick leave, staff turnover, and cases of post-traumatic stress disorder.[27]

Plaintiff restates the foregoing as his own alleagtions.

57.    In 2020, a Comptroller Report found numerous staffing deficiencies at CoreCivic operated facilities *again*. CoreCivic, including the TTCC, had several repeat offenses that were cited in the 2017 Comptroller Report. The following excerpts are from the report:

At the facilities we visited, we found that, on average, they operated with fewer than the approved number of correctional officers while noncritical posts, such as transportation and recreation, were consistently under-staffed or closed. **Low staffing levels coupled with frequent overtime impacts management's ability to provide safe and secure facilities, especially in emergencies.** Despite management's stated corrective action after the November 2017 performance audit and efforts to accurately track staffing positions on a monthly basis, **CoreCivic facilities' monthly staffing reports contained the same errors noted in the prior audit,** so department management cannot effectively track whether CoreCivic is meeting its contractually required staffing levels.

Two CoreCivic-managed correctional facilities operated with fewer than approved

---

26 2017 Comptroller Report pp. 7-8.
27 2017 Comptroller Report pp. 12-13 (emphasis added).

correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and **left critical posts unstaffed**;

CoreCivic staffing reports at Trousdale Turner Correctional Center and Hardeman County Correctional Facility contained numerous errors.[28]

Plaintiff restates the foregoing as his own allegations.

58.  The 2020 Comptroller Report also found TDOC's management failed to "implement or enforce established internal controls to ensure state and CoreCivic correctional facility staff collected and accurately reported incident information" relating to "inmate deaths, inmate assaults, inmate violence, correctional officers' use of force, inmate accidents and injuries, and facility lockdowns."[29]

59.  In addition to not accurately reporting incidents CoreCivic has been caught *fabricating* evidence in an attempt to avoid legal liability.[30]

60.  The 2020 Comptroller Report called into question the veracity of the TTCC's reporting noting that "health services staff had not entered any serious accidents or injuries on the accidents screen in TOMIS" over a one-and-a-half-year period at the TTCC, which they found "questionable given the nature of the correctional environment."[31] TTCC administrative officials admitted to the findings and pled ignorance.

61.  Data reported to Tennessee regulators showed that the TTCC had the highest number of Class A incidents out of all Tennessee prisons.[32] The TDOC defines Class A incidents as: "life-threatening matters and breaches of security that are likely to cause serious operational problems," including "escapes and attempted escapes, deaths, assaults, hostage situations, total

---

28 2020 Comptroller Report p. 5 and 9 (emphasis added).
29 Comptroller Report p. 3 Audit Highlights, Key Conclusions. ·
30 *See e.g.,* Brinley Hineman, *After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment TDOC,* THE TENNESSEAN (August 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/.
31 2020 Comptroller Report, p. 40.
32 2020 Comptroller Report, pp. 62 and 65-67.

institutional lockdowns, rapes, certain uses of force, and various weapons."[33] CoreCivic was able to accomplish that extraordinary result in spite of the fact that "CoreCivic correctional facilities staff did not appropriately maintain original documentation of Class A incidents."[34]

62.    On December 12, 2017, former TTCC correction officer Ashley Dixon testified before a Tennessee legislative committee. Ms. Dixon resigned from CoreCivic because she witnessed two inmates die from medical neglect during her seven months employed at the TTCC. Ms. Dixon testified to the lawmakers stating that she pleaded with her supervisors for three days to help an inmate who was dying. She subsequently complained to company officials who also ignored her pleas.[35]

63.    On June 15, 2019, TTCC inmate Ernest Edward Hill was found unconscious by prison officials and life saving measures were attempted. Mr. Hill died later at the hospital. After an investigation conducted by the Tennessee Bureau of Investigation Mr. Hill's cellmate was charged with second-degree murder.[36]

64.    On January 25, 2020, TTCC inmate Frank Lundy was found injured at the entrance of a housing unit and later pronounced dead at the hospital. Reports indicate Mr. Lundy had been stabbed in the neck resulting in the fatal injury.[37]

65.    On February 24, 2021, Terry Childress was brutally murdered in his TTCC Alpha Unit cell by an inmate who was improperly classified.[38] At the time Mr. Childress was murdered,

---

33 2020 Comptroller Report, pp. 31-32.
34 2020 Comptroller's Report, p. 38 # 4, and the graph appended as Appendix-B-2.
35 Ashley Dixon interview, *see* Steven Hale, **Problems Persist at Tennessee's Mismanaged Prisons**, THE NASHVILLE SCENE (Jan. 22,2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennesseesmismanaged-prisons.
36 Hineman, Brinley, **"Murfreesboro man charged in death of prison cellmate at TTCC Turner Correctional Facility,"** Feb. 20, 2020, available at: https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-deathprison-cell-mate-ernest-hill-TTCC-turner/4818354002/.
37 Gregory, Chris, **"Inmate killed in assault at TTCC prison,"** THE LEBANON DEMOCRAT, January 30, 2020, available at https://www.lebanondemocrat.com/hartsville/inmate-killed-in-assault-atTTCC-prison/article_4808fd72-b736-5dba-8607-e510d899e1e2.html.
38 *See e.g., Newby et al. v. CoreCivic et. al.*, No,: 3:22-cv-93 (M.D. Tenn. 2022).

22

CoreCivic had actual knowledge that his murderer posed a heightened security risk and was a volatile and dangerous inmate with a history of violence because his information is readily available on the TDOC's Tennessee Offender Management Information System (e-Tomis). The TTCC Alpha Unit has five pods and therefore five positions that are to be filled as *critical posts*. When Mr. Childress was murdered only two of the five positions were staffed. At the time of Childress' death the TTCC was routinely understaffed resulting in correction officers having to do the work of officers whose posts were not filled.[39] Plaintiff still observes correction officials routinely doing the work of unposted officers. As a result, the ones he sees so doing regularly he can tell that they are very fatigued.

66. In January of 2022, Plaintiff returned from work and observed two inmates fighting. The fight lasted for several minutes before the inmates finally just stopped. No correction officer responded thereto. After the fight one inmate was observed by Plaintiff walking up and down the stairs with blood all over his shirt like it was a badge of honor.

67. Sometime in the beginning of 2022, inmate Mario Scales was robbed in the Whiskey Unit Delta Pod by another inmate. As a result, his family put pressure on prison officials to move him to a TDOC operated facility by way of threat to file a lawsuit. The night correction officials came to tell him to pack up his property because he was being transferred he was robbed again after the officer left by the same inmate.

68. Sometime in the beginning of 2022, Plaintiff's "bunkie" Jimmy was attacked in the bed area as Plaintiff was returning from the shower. Plaintiff had just sat down on his bed to dry his feet when 3 inmates attacked Jimmy. During the attack Jimmy was forced on to Plaintiff's bed somewhat on top of Plaintiff. Plaintiff worked his way free of the attack soon after it started. No correction officer responded thereto.

---

39 *Id.*

69. Around August of 2022, two inmates fought in the middle of the Whiskey Unit Delta Pod. They fought for about 5 minutes. No officers responded thereto.

70. On 4/16/2022, multiple inmates were stabbed. Some died and were covered with a tarp in intake. There were 3 inmates reported to Plaintiff as being dead. That particular day the TTCC was insufficiently staffed and one correction officer transported two inmates to the hospital for medical treatment contrary to security protocol—a minimum of 2 officers are required for transport. Some correction officers who were coming from other facilities as TDY's to help fill posts quit coming after the aforementioned incident.

71. On 4/24/2022, Plaintiff overheard a correction official state that the TTCC was short staffed by 126 correction officers. The TTCC has a required total of 183 correction officer positions.[40]

72. On 5/5/2022, an inmate in Whiskey Unit Alpha Pod died.

73. On 5/11/2022, an inmate in the Delta Unit Bravo Pod was stabbed by inmates from Bravo Unit. There was also an inmate stabbed in the Alpha Unit.

74. On 5/12/2022, the TTCC went on lock-down. After the TTCC was already on lock-down a "Code Blue" was called over a correction officer's radio announcing that inmates in the Echo Unit had "popped-out" of their cells and stabbed another inmate ("Code Blue" means inmate-on-inmate attack). During this lockdown a multitude of homemade knives were found during a shakedown of the prison.

75. On 5/31/2022, an inmate was stabbed in the Alpha Unit that day, or just prior to it. The Tennessee Bureau of Investigation (TBI) and other investigators were at the TTCC to investigate. Plaintiff's work crew avoided going into the building that day to stay out of their way.

---

40  2020 Comptroller Report p. 131

76.     On 6/16/2022, an inmate in Alpha Unit Charlie Pod cell 108 was stabbed. Plaintiff went to work on the electricity in his cell and he refused to come out for us to work.

77.     On 7/6/2022, an inmate in Whiskey Unit Alpha Pod died. The TBI was here to investigate the next day.

78.     On 7/14/2022, three inmates were stabbed in Bravo Unit, one of whom was thrown over the rail from the second tier. The incident was reported on NBC News Channel 4 out of Nashville, Tennessee.

79.     On 7/24/2022, inmates from Echo Unit were in the Whiskey Unit Delta Pod on first shift. Their orange wristband was visible to Plaintiff and must have been to the correction officer who let them in. The 1 second shift female officer was in the rotunda in the wee hours of the morning and had at least B, C, and D pod doors unsecured with inmates moving in and out of the pods at will.

80.     On 8/2/2022, an inmate in Bravo Unit was reported as being stabbed that afternoon. Three more were stabbed around 7pm, two of whom were reported as being life-flighted out for medical treatment.

81.     On 8/18/2022, a correction officer was stabbed in the Alpha Unit.

82.     On 10/14/2022, Chief of Security Williams and Lieutenant Jent were attacked and stabbed in Echo Unit. They were life-flighted to the hospital where Chief Williams spent some time in the intensive care unit with what was said to have been a punctured lung.

83.     Plaintiff was in the clinic on 11/30/2022, with an inmate who had been previously life-flighted out of the TTCC after being stabbed. He said he had to have 97 stitches.

84.     On 12/9/2022, there was a gang altercation on the west end of the compound that involved four inmates, two of which were taken to an outside hospital.

85.     On 1/7/2023, at approximately 9:40pm the correction officers who had just

25

counted the Whiskey Unit went down the hall toward the entrance/exit of the building. The fire alarm for the Whiskey Unit went off around 10:10pm and the correction officials did not come back up the hall until several minutes later.

86. On 12/15/2022, while at the law library an inmate who said he was with a gang informed Plaintiff that the next day his affiliation was thinking about having a "sit down" where no inmates would be permitted to go to their jobs or anywhere else because the TTCC administration was holding everyone's Christmas packages hostage. He looked at Plaintiff and said that if anyone left their pod they would be "stuck-on" when they came back in. The same inmate—who does not live in Plaintiff's pod—was in Plaintiff's pod at around 4:20pm that same evening and was upstairs near the area where Plaintiff lives. Fortunately, the TTCC passed out the packages the next day.

87. Per Mike Boldin, on 12/16/2022, only 4 correction officers clocked in and worked second shift for the whole compound's housing units.

88. Per Mike Boldin, on 12/17/2022, only 7 correction officers clocked in and worked first shift for the whole compound's housing units.

89. Per Mike Boldin, on 12/23/2022, 3 inmates were stabbed in Bravo Unit and TTCC officials gassed all 3 pods in the Unit.

90. On 12/27/2022, at around 10:40pm 3 correction officials counted the Whiskey Unit Delta Pod where they observed and spoke with an inmate who was sweating profusely, jumping around beating on his chest, and making a loud grunting noise. Based on Plaintiff's personal observation and knowledge the inmate was obviously high on a controlled substance. The correction officers called the captain and reported the inmates behavior on their two-way radio. The captain said over his radio that he did not have anywhere to put the inmate and told them to leave him in the pod—open-bay pod have you. After speaking with Joe Miller and Kevin

26

Dunn about the insanity of such, they said the same inmate had been within a few feet of Plaintiff's bed not long before the correction officers came in to count. Plaintiff was asleep at the time the drugged-out inmate was next to his bed but woke up when the officers came in to count and the commotion escalated. All of the inmates in Plaintiff's pod were watching the officials' response and expressing concern for their safety because of it.

91. On 2/10/2023, an inmate in the Alpha Unit was stabbed. Plaintiff is also aware that former TTCC Correction Officer Jones opened a pod door in the Charlie Unit and let an inmate into a pod who killed another inmate. Correction Officer Jones then let the same inmate who had just killed someone into another pod where he tried to kill another. This practice is not exclusive to Correction Officer Jones. Most all officers at the TTCC let inmates in and out at will. This routine practice causes Plaintiff to fear for his current and future safety at the TTCC.[41]

92. TDOC requires its high level security officials to watch so many hours of video surveillance each week to ensure that security protocols are being adhered to by correction officers. If high level officials or correction officers at the TTCC are watching video surveillance they must be aware of inmates moving from pod to pod and building to building, yet it continues.

93. On 2/12/2023, Plaintiff watched correction officials walk down the hallway of the Whiskey Unit toward where the entrance/exit is at 3:26pm. At 4:34pm the fire alarm went off due to an electrical fire in the Whiskey Unit Delta Pod where Plaintiff lives. Fortunately the fire was able to be contained by some fast thinking inmates. The correction officer did not come back into the rotunda until 4:44pm. The Whiskey Unit did not have an officer present for approximately one hour and eighteen minutes.

94. On 2/13/2023, 2 inmates in the Alpha Unit "popped-out" of their cells and got

---

41 *See,* Exhibit 5, *Adams' Journal,* pp. 15-16 entries 1/27/2023 and 2/4/2023 *Note*, and *e.g.,* entries that show IMFOPIP (inmates from other pods in pod), IMFOUIP (inmates from other units in pod), or OOPCO (out of place call out). The practice is so frequent Plaintiff quit recording it.

27

into another pod where they assaulted and stabbed an inmate whose finger was allegedly severed.

95. On 2/14/2023, there was a fight about 20 feet away from Plaintiff's bed which lasted for several minutes. No correction officer responded thereto.

96. On 3/10/2023, an inmate was stabbed in Echo Unit despite the TTCC being on lockdown.

97. On 3/29/2023, an inmate in Whiskey Unit Charlie Pod was stabbed.

98. On 4/22/2023, an inmate in the Whiskey Unit Alpha Pod was stabbed.

99. On 5/16/2023, an inmate in Fox Unit Bravo Pod tried to file a Prison Rape Elimination Act (PREA) report against his cellmate. TTCC staff put him back in the cell with his cellmate who then stabbed him.

100. On 6/1/2023, the fire alarm went off in the Whiskey Unit at 12:55am. Plaintiff got out of bed and walked to the window by the officers station/rotunda. There was no officer in sight. At 1:00am a female officer came into the rotunda from toward the entrance/exit of the building and went to Whiskey Unit Bravo Pod. She cleared the fire alarm at 1:03am.

101. On 6/4/2023, correction officer Betrand was stabbed in Bravo Unit sometime around the 9pm count.

102. On 6/7/2023, there was an altercation between Whiskey Unit staff and an inmate out of Whiskey Unit Bravo Pod. Lieutenant Bartlett was stabbed twice during the incident.

103. On 6/10/2023, correction officer Meador and another officer were stabbed by two inmates in the Echo Unit. One officer was said to have been stabbed in the eye. Another inmate was found dead in the Delta Unit. The incidents were reported on WKRN News Channel 2 out of Nashville, Tennessee.

104. Beginning on or about 6/10/2023, correction officials shook-down the TTCC

28

where they *ransacked* inmates' personal property. The manner in which officials *ransacked* and took inmates' property is strictly prohibited by TDOC policy.[42] They did it anyway. TTCC officials routinely have a "I can do whatever I want and there's nothing you can do about it" attitude. Because of the TTCC officials' attitude inmates at the TTCC are constantly frustrated and angry. Inmates at the TTCC are weary of being treated this way and continue to lash out because of the same.

105.    The 2020 Comptroller Report noted 328 knives found in 2018. These are just the ones that were found and reported.[43] Knives are still readily available at the TTCC as evinced by the stabbings and murders described herein.

106.    Fights are a common occurrence at the TTCC. Most are not reported for fear of repercussions from the perpetrators of the violence. A "snitch" at the TTCC will be subjected to violence himself, therefore inmates "stay in their own lane," in other words, "mind their own business." Thus, Plaintiff stays in his own lane.

107.    Tennessee inmates housed within CoreCivic facilities are approximately two times as likely to die and four times more likely to be murdered than those housed in TDOC operated facilities.[44]

108.    Plaintiff used to work in the Alpha Unit at the TTCC doing maintenance. The

---

42 *See,* TDOC Policy, 506.06, *Searches* § VI (I)(3)(a) , available at: https://www.tn.gov/correction/about-us/policies-and-procedures.html ("After a search, a room should be left as was found, never in disorder. Inmates personal property shall be respected and shall not be willfully discarded, broken, or misplaced.").

43 2020 Comptroller Report p. 67.

44 *See e.g.,* Cassandra Stephenson, ***Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show,*** JACKSON SUN (January 28, 2020), https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but account for about 63% of the state's prison homicides."); PRISON LEGAL NEWS, ***CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities,*** PLN (August 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("[F]rom2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons.").

Alpha Unit is where protective custody, administrative segregation, and punitive segregation inmates are housed. Inmates in the Alpha Unit frequently have their food ports rigged so that they may open them at any time. Correction officers would give Plaintiff's supervisor a list of food ports that needed to be fixed. Oftentimes, shortly after being fixed the same food ports were right back rigged and would be fixed again. This enables inmates to be able to potentially "pop-out" of their cells and move around freely. Inmates in the Alpha Unit are not supposed to be out of their cells without being cuffed and escorted by a correction officer. Because of this, Plaintiff fears for his future safety were TTCC officials to house him in the Alpha Unit.

109.  Plaintiff should not have to serve his term of incarceration in protecitve custody isolated from general population and other human beings for fear of his safety because CoreCivic does not want to provide sufficient staff for the sake of profit. Based on Plaintiff's personal observations working in the Alpha Unit at the TTCC, aside from being dangerous,[45] the inmates housed therein live under deplorable conditions. Plaintiff observed the Alpha Unit routinely understaffed when he worked in there, often having only 2 or 3 officers when there is supposed to be 5. The inmates therein are isolated from other humans, rarely get to have recreation, rarely get cleaning supplies, experience difficulty getting to use the phone to stay in contact with their family and friends, and sometimes experience difficulty getting to take a shower. Moreover, as a result of the chronic short staffing the required thirty-minute security checks are often not done resulting in the death of inmates.[46] Plaintiff has worked in a single pod in the Alpha Unit for two to three hours at a time on numerous occasions and not seen one security check conducted for the whole time other than when the correction officers would go through and count (His work crew was assigned to maintain that unit for over a year.).

110.  As a result of the lack of correction officers at the TTCC, Plaintiff and other

---

45 *See e.g.,* EXHIBITS 1, 2, and 16.
46 *Id.*

inmates in general population rarely get to have recreation, rarely have educational classes, experience difficulty receiving mail, are often unable to utilize the law and leisure library, have very few rehabilitative programs, and often do not get to have religious services. In addition, the TTCC has been on lockdown for over 125 days for 2023, thus far. Based on Plaintiff's personal observation this lack of constructive activities and constant lockdowns is causing unrest and anger among all TTCC inmates to include Plaintiff.

111.    The grievance procedures at the TTCC are effectively futile because of, *inter alia,* understaffing, often leaving inmates angry and even furious. Because of understaffing, grievance personnel are often reassigned elsewhere to cover other positions resulting in grievances not being processed in a timely manner pursuant to TDOC policy. It can take months to process a grievance.[47] This leaves inmates, including Plaintiff, angry and frustrated because they can not get reasonable help through the system designed for such. It is Plaintiff's belief that this is by design to avoid liability when inmates do not understand the process.

112.    Based on sound correctional policy Tennessee's General Assembly requires inmates in the TDOC's custody to work. *See,* T.C.A. § 41-1-102, 41-21-207, and 41-22-403. The TDOC allocates money in the daily inmate per diem of approximately $75.48 provided to CoreCivic to pay inmates for work performed.[48] Because of the constant lockdowns many inmates are unable to work and thus do not receive their pay. CoreCivic realizes more profit when it does not have to pay inmates when they are on lockdown and do not get to work.

113.    Plaintiff and Kevin Dunn have personally witnessed correction officers walk off and leave an inmate desiring protective custody and make him *wait* in the pod where he is seeking protection from. Sometimes for hours. Jimmy Conaser has also seen officials refuse to

---

47 *See e.g.,* EXHIBIT 18, *esp.* p. 3.
48 EXHIBIT 19, p. 38, Contract p. 39 § BB(5).

let inmates check into protective custody in turn be raped after the refusal thereof.[49]

114.     TTCC administrative officials who are aware of the propensity for violence at the TTCC come into the Whiskey Unit Delta Pod and routinely threaten to move low-risk minimum custody inmates to Bravo and Echo Units where the TTCC houses high-risk, violent, medium custody inmates.[50] Bravo and Echo Units are the most dangerous and volatile units at the TTCC. Plaintiff fears for his future safety in the event TTCC officials were to house him in Bravo or Echo Units.

115.     On November 3, 2022, Plaintiff filed a grievance relating to TTCC officials housing medium custody inmates in the Whiskey Unit open-bay barracks style pod. TTCC officials responded to the grievance stating: "Although we try to house inmates according to their classification we do not have to. We house inmates according to the bed space we have available."[51] Inmates housed in the Whiskey Unit should be minimum-restricted custody level but correction officials knowingly house more dangerous, volatile medium custody inmates therein. TDOC Policy 506.14, *Housing Assignments* § VI(C)(1) sets forth that "[i]nmates in the general population should normally be of the same custody level when double-celled . . . ."[52] The Whiskey Unit can be likened to double-celling on a grand scale. Housing minimum custody inmates with medium or higher custody level inmates is contrary to well established correctional policy.[53] This routine practice of TTCC correction officials puts Plaintiff's and other inmates' safety at risk and exhibits deliberate indifference to the same. Under provision of TDOC policy wardens are expressly responsible for classification decisions.[54]

---

49 Exhibit 14 p. 2 ¶ 15 Declaration of Kevin Dunn; EXHIBIT 15 p. 1 ¶ 3 Conaser Declaration; *see also supra* ¶ 49.
50  *See also,* EXHIBIT 14 p. 1 ¶ 9 Declaration of Kevin Dunn
51  Attached hereto as EXHIBIT 17, Grievance # 357358, is a true and accurate copy of the grievance , p.4.
52  *See,* TDOC Policy 506.14, *Housing Assignments* § VI (C)(1), page 4 of 5 available at:
https://www.tn.gov/correction/about-us/policies-and-procedures.html.
53  EXHIBIT 11 p.3 ¶ 13, Gravette Declaration.
54  TDOC Policy 401.08 *Classification Hearing Process* § VI(I), p. 4 of 5 available at: https://www.tn.gov/correction/about-us/policies-and-procedures.html ("The warden [] is, as always, ultimately responsible for the actions of the classification panel and for the appropriateness of classification actions.")

116. According to former TTCC correction officer Treyton Lattimore there is a pattern of CoreCivic hiring a bunch of people and then firing a bunch of people.[55] In the *Lattimore Interview* they discuss the murder of inmate Aaron Blayke Adams in the TTCC's Alpha Unit by his cellmate, an inmate Elledge. Mr. Lattimore was of the opinion that if the TTCC had been "properly staffed" at the time of Mr. Adams' murder "that the incident would have turned out way different."[56] Mr. Lattimore opined that the understaffing of the TTCC is because of "the power of the almighty dollar."[57] Mr. Lattimore said that understaffing definitely helps CoreCivic "save money." He stated:

> Because what they'll do is, like they'll [hire] a bunch of people, and then they'll start firing a bunch of people. And then they'll [hire] a bunch more and then they'll fire a bunch more.

> And then, you know, they would rather pay, you know, eight officers on night shift a bunch of overtime to run that entire facility, you know, versus having three officers per unit 24 hours a day, which they're supposed to.[58]

117. Since arriving at the TTCC in October 2021, Plaintiff has personally observed correction officer staffing levels rise and drop continually.

118. Defendants TDOC and Commissioner Strada have actual knowledge of the TTCC's long-standing and pervasive history of extreme understaffing and high levels of violence. Indeed, they are aware of them from reports filed directly to the department and their office. "All compliance results [from the TDOC's TTCC Contract Monitor] are reported to Executive Staff through written reports as well as a presentation either during an executive briefing or during the Annual Commissioner's tour. . . .[T]he Commissioner and Executive staff are engaged in the [compliance] process."[59] In addition, Trousdale County is contractually

---

55 EXHIBIT 16, p. 34 lines 1-10.
56 EXHIBIT 16 p. 23 lines 16 and 16, *Lattimore Interview*.
57 *Id.* p. 34 lines 1-2 and p. 33 line 19.
58 *Id.* p. 34 lines 1-10; *see also supra*, ¶¶ 87 and 88.
59 2020 Comptroller Report p. 18.

obligated to report to the TDOC about various operations at the TTCC to include but not be limited to:

> a) Inmate institutional records on each Inmate including, but not limited to, personal data, personal inventory receipts, Inmate Discipline reports, Incident reports, release information, classification and counseling records, dental, psychiatric and medical records.
>
> b) Documentation regarding complaints against Contractor's staff, the number and nature of violent or other disruptive incidents among Inmates or against staff, the number and nature of disciplinary actions against staff, the rate at which Inmates complete programs successfully, the number of Inmates productively active on paid TRICOR work assignments and Facility work assignments, and the level of production;.[60]

Accordingly, because of the thorough reporting system established between the TDOC and Trousdale County they both have actual knowledge of operations at the TTCC.

119. At the beginning of 2023, the TDOC had a large number of officials at the TTCC which Plaintiff saw talking to inmates and examining records. Plaintiff saw them looking at the log books in his unit. Even so, Defendants TDOC and Strada have consciously neglected to remedy the TTCC's chronic understaffing despite their actual knowledge of the extraordinary and frequently fatal inmate-on-inmate violence enabled by it.

120. On 7/11/2023, Commissioner Strada personally visited the TTCC. It was short-staffed.

121. The TDOC nor Commissioner Strada have sent correction officers to the TTCC to partially takeover and fill *critical posts* until such time as CoreCivic can fill the positions. There is a provision in the contract between the TDOC, Trousdale County, and CoreCivic that allows the TDOC to partially take over operations of the TTCC.[61]

122. Even with all of the foregoing reports of murder, brutality, criminal behavior, neglect, and inmate deaths at CoreCivic facilities in general, particularly at the TTCC, in May of

---

60 EXHIBIT 19 p. 35, Contract p. 36 § X(1)(a) and (b); *see also* EXHIBIT 19 p. 42, Contract p. 43 § A.4(h) and (i).
61 EXHIBIT 19 pp. 38-39, Contract pp. 39-40 § JJ(1) and (2).

2021, the Trousdale County Commission approved another five year contract with CoreCivic to house TDOC inmates at the TTCC. They are contractually obligated to the TDOC to ensure that the terms and conditions of their contract are performed;[62] they agree to provide "adequate staff," and they agree to "comply with all applicable federal, state, and local constitutions, laws, and regulations. . . ."[63] Trousdale County has failed in their lawful duty to oversee and ensure that CoreCivic, *inter alia,* adequately staffs the prison.

**123.** The TDOC Commissioner, as the Chief Executive Officer/policymaker for the department has not promulgated a policy or made provision in the contract to only allow CoreCivic to house the number of inmates that it has staff to fill *critical posts* for. The TDOC is the one responsible for sending inmates to the TTCC.

**124.** Plaintiff requested a transfer away from the TTCC through an information request personally hand-delivered to Classification Coordinator Tari Crawford expressing concern for his current and future safety, and during his September 2022, annual reclassification hearing involving Ms. Crawford because of concerns regarding severe understaffing.[64] Defendant Tari Crawford, as the TTCC Classification Coordinator, is the warden's designee and approving authority on all matters relating to classification.[65] However, wardens are ultimately responsible for classification actions. [66]

**125.** Prior to becoming the TTCC Classification Coordinator Tari Crawford worked as a correction officer at the TTCC and knows the dangers of understaffing. Plaintiff routinely sees her moving around from building to building on the TTCC compound so she also has actual knowledge of how woefully understaffed the prison is. Moreover, Ms. Crawford has actual

---

62 EXHIBIT 19 p. 49, Contract p. 50 § D.5 *Subcontracting.*
63 EXHIBIT 19 p. 15, contract p. 16 § A.3(c)(10)(A)(1)and(2).
64 EXHIBIT 6 pp. 1-7, *esp.* pp. 1-2 and 5.
65 EXHIBIT 6, p. 2, *Approving Authority* signature line.
66 *See supra,* n. 54.

knowledge of how dangerous the TTCC Alpha Unit is because her office is therein. Despite her knowledge she refuses to transfer Plaintiff.

126.    In response to a letter to former TDOC Commissioner Lisa Helton from Plaintiff in July of 2022, requesting a transfer due to inadequate staffing at the TTCC, TDOC officials "forwarded [Plaintiff's] concerns on to the appropriate parties within TDOC for their review and further action if necessary."[67] Plaintiff also sent a letter to TDOC Commissioner Frank Strada expressing concern about his current and future safety at the TTCC due to severe understaffing, yet Plaintiff currently remains there.[68]

127.    CoreCivic has—and it has long had—actual knowledge that the TTCC is severely understaffed through, *inter alia,* continuous lawsuits filed against it and profits realized. Indeed, the TTCC is understaffed deliberately because paying for sufficient staffing is expensive and understaffing is more profitable. The less money that CoreCivic spends on staffing the TTCC the more profit it realizes for its shareholders. CoreCivic acts at all times to enhance the profits of its shareholders. It generates more profit by paying liquidated damages to the TDOC for not filling *critical posts* than it does filling them.

128.    Defendant Hininger, CoreCivic's Chief Executive Officer, has actual knowledge of the TTCC's chronic understaffing through, *inter alia,* continuous lawsuits filed against him and CoreCivic, and profits realized. Even so, he has willfully failed to remedy the TTCC's understaffing and the heightened risk of fatal inmate-on-inmate violence resulting from it, both because understaffing is more profitable and because he must not care when inmates in CoreCivic's care are needlessly assaulted or die. Moreover, despite this knowledge, he has not reduced the TTCC population to a level commensurate to the number of correction officers he has to fill *critical posts*. He seeks to maximize profits at the expense of providing Plaintiff with

---

67 Attached hereto as EXHIBIT 7 p. 1, is a true and accurate copy of the letter received by Plaintiff.
68  EXHIBIT 7, pp. 1-3.

reasonable personal safety.

129.     Defendant Conry, CoreCivic's Vice President of Operations Administration, also has actual knowledge of the TTCC's chronic understaffing through, *inter alia*, continuous lawsuits filed against him and CoreCivic and profits realized. Even so, he has similarly failed to remedy the TTCC's understaffing and the heightened risk of fatal inmate-on-inmate violence resulting from it, because understaffing is more profitable and because he too must be unbothered when inmates in CoreCivic's care are needlessly assaulted or die. Moreover, despite this knowledge, he has not reduced the TTCC population to a level commensurate to the number of correction officers he has to fill *critical posts*. He too seeks to maximize profits at the expense of providing Plaintiff with reasonable personal safety.

130.     Defendant Vincent Vantell is the Warden of the TTCC. He is responsible for overseeing the day to day operations of the prison. T.C.A. § 41-1-104(b). He has actual knowledge of the TTCC's extreme understaffing problems. Indeed, since his arrival as Warden of the TTCC Plaintiff has seen major decreases in correction officers and has heard constant scuttlebutt of they're quitting. It is Plaintiff's understanding from a conversation involving staff he overheard, that prior to Warden Vantell's arrival at the TTCC they were only about 40 correction officers short of being fully staffed, and are currently now well over 100 officers short. Under Mr. Vantell's watch the TTCC is woefully understaffed and getting worst.

131.     It is Plaintiff's belief that when this Court and the TDOC put pressure on CoreCivic they hire a bunch of officers. In turn, they bring a Warden like Vantell in to fire a bunch to get the profits back up under the guise of cleaning house. The 2020 Comptroller Report listed, at that time, an approved staffing pattern that equated to a ratio of 1 correction officer for every 14 inmates, or, 183 correction officers for 2,552 inmates.[69]

---

[69] 2020 Comptroller Report, p. 131.

132. Warden Vantell's response to the violence at the TTCC has exacerbated the problem. The constant lockdowns and lack of correctional services described herein are making matters worse. In addition, at times inmates are not being permitted to talk and/or visit with their families for a time. He stops commissary from being acquired further angering inmates. The inmates at the TTCC are growing very weary of being punished for the sins of others and are becoming angrier by the day. Once again, Plaintiff re-asserts that these problems too, find their roots in a lack of staff.

133. Defendant Vantell has personally observed the understaffing each day as he moves around the facility. He has consciously neglected to remedy the TTCC's chronic understaffing despite his personal knowledge of the frequent inmate-on-inmate violence enabled by it. Indeed, he has contributed to the understaffing and resulting violence by firing officers or causing them to quit for various reasons. He has a duty to protect the inmates in his care. T.C.A. § 41-21-201. Prior to Warden Vantell's arrival at the TTCC Plaintiff overheard correction officers say they were going to quit if CoreCivic brought him there because they knew him from when he was previously an Assistant Warden at the TTCC. Moreover, despite his actual knowledge that the TTCC is understaffed, Warden Vantell has not reduced the TTCC population to a level commensurate to the number of correction officers he has to fill *critical posts*. He too seeks to maximize profits at the expense of providing Plaintiff with reasonable personal safety.

134. Defendant Vantell also has actual knowledge of the frequency and severity of the *reported* violence at the TTCC because he is required to review incident reports entered on e-Tomis to ensure their "clarity and accuracy."[70] However, many incidents are *not reported*.

135. At one time, CoreCivic instructed its new hire employees to stay off of the former "Trousdale-Turner-Close-It-Down" Facebook page and to not provide information to Nashville

---

70 2020 Comptroller Report p. 36.

Attorney Daniel Horwitz during their training.[71]

**136.** CoreCivic and TTCC administrative officials are, or must be aware of, generally accepted prison staffing requirements because CoreCivic has been operating prisons for the TDOC, other states, and the federal government for decades.

**137.** The allegations set forth herein are not even remotely close to being exhaustive. They demonstrate that CoreCivic and its employees adopt and enforce a corporate policy of understaffing to maximize profits. This policy is long-standing, pervasive, widespread, and leads to assaults, deaths, murders, rapes, and extortion. These are predictable consequences of the corporate understaffing policy encouraged and promoted by CoreCivic.

**138.** As a result of Defendants' failure to staff *critical posts*—and the pervasive violence, unrest, edginess, and volatility it is causing—Plaintiff fears for his current and future safety at the TTCC, thereby depriving him of his right to the full enjoyment of the protections provided by the Eighth Amendment of the United States Constitution and Tennessee Constitution Article I § 32.

**139.** Plaintiff restates all quotes from the reports, contract, and all sources herein set forth as his own allegations.

## V. CLAIMS FOR RELIEF

### COUNT # 1: 42 U.S.C. § 1983 AND *MONELL V. DEPT. OF SOCIAL SERVICES*, 436 U.S. 658 (1978)—DELIBERATE INDIFFERENCE TO REASONABLE PERSONAL SAFETY: (AS TO DEFENDANTS CORECIVIC, DAMON HININGER, STEVE CONRY, VINCENT VANTELL, TARI CRAWFORD, TROUSDALE COUNTY, AND FRANK STRADA; (collectively "DEFENDANTS," hereafter where so referred)

**140.** Plaintiff incorporates and re-alleges the foregoing allegations as if fully set forth herein.

**141.** At times relevant to the complaint all Defendants were performing duties within

---

71 EXHIBIT 11 p. 2 ¶ 4, *Peyton Declaration.*

the scope of their employment and acting under color of state law.

142. Through various terms, agreements, and conditions set forth in their three-party contract, all contractual parties/Defendants agree to lawfully and reasonably care for Plaintiff.

143. At times relevant to this Complaint Defendants have legal duties under the Eighth Amendment to protect Plaintiff from, *inter alia,* violence at the hands of other prisoners by ensuring there is adequate staff to respond to potential inmate-on-inmate attacks, or, fire and medical emergencies. The Constitution requires prison officials to provide "reasonable safety" for Plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). Plaintiff is not required to wait until an assault has occurred before obtaining injunctive relief. *Id.* at 845. Or, God forbid, death, when it is then too late.

144. Frank Strada is the Commissioner of the TDOC. "The department of correction is under the charge and general supervision of the commissioner of correction." T.C.A. § 4-3-602. Commissioner Strada "is the executive officer of the department of correction and has the immediate charge of the management and government of the institutions of the department. . . ." T.C.A. § 4-3-603. As an inmate in the TDOC's custody, Commissioner Strada is responsible for Plaintiff's safety. State law charges Commissioner Strada with a duty to monitor contracts with those whom he enters therein with to house TDOC inmates, T.C.A. § 41-24-109, and to visit prisons and ensure that "laws, rules and regulations" are being complied with. T.C.A. § 41-1-106. He has failed in his lawful duty to ensure that Trousdale County enforces the terms of their contract with CoreCivic. The contract that proximately permits TDOC inmates to be housed at the TTCC can be terminated or the TDOC may partially takeover the TTCC under terms therein. It has done neither. Defendant Strada's actual knowledge of the understaffing of correction officers at the TTCC, and his causing Plaintiff to remain there despite Plaintiff's expressed concerns relating thereto, constitutes deliberate indifference to Plaintiff's safety.

40

145. Commissioner Strada is a necessary party to this action under provisions of Federal Rules of Civil Procedure 19 and 20. He is, at a minimum, connected to this case as a state official who has the authority to carry out injunctive relief should such issue from the Court to ensure Plaintiff is accorded complete relief.

146. At times relevant to this complaint, Defendant CoreCivic has acted under color of state law, has performed government functions, has entwined itself in a symbiotic relationship with the TDOC, and is engaged in a traditional state function. *Brentwood Academy v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288 (2000). Under the principle established in *Brentwood Academy*, CoreCivic is a "person" within the meaning of 42 U.S.C. § 1983 and is subject to suit.

147. At times relevant to this complaint, Defendant Trousdale County has acted under color of state law, has performed government functions, has entwined itself in a symbiotic relationship with the TDOC, and is engaged in a traditional state function. *Brentwood,* 531 U.S. 288. Under the principle established in *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), CoreCivic is a "person" within the meaning of 42 U.S.C. § 1983 and is subject to suit.

148. CoreCivic has an unconstitutional policy of maintaining staffing levels that are insufficient to ensure that inmates like Plaintiff and others are protected from inmate-on-inmate violence and accorded reasonable responses to medical and fire emergencies.

149. CoreCivic's pervasive and wide-spread understaffing policy causes Plaintiff to have a healthy fear for his current and future safety. The TTCC'c environment causes constant anxiety, tension, and uncertainty for Plaintiff as to when the volatile environment is going to explode. There is a reign of violence at the TTCC, or at a minimum, it is rampant as demonstrated by the *known* incidents set forth herein. In accordance with the TDOC's policy this creates a hazard to Plaintiff and all inmates' safety in general. The understaffing results in overworked correction officers who make mistakes, such as: letting inmates into pods and

buildings where they do not live who murder or assault others, moving inmates into cells or the Whiskey Unit open-bay dormitory who have a higher security classification and are known to be aggressive/violent, staff who are disrespectful and make arbitrary decisions, lack of help through the grievance process, and inexperienced staff because of the high turnover rate who are easily manipulated. Knives are readily available at the prison even after shakedowns. In light of this actual knowledge, Defendants CoreCivic, Hininger, Conry, and Vantell have tolerated, acquiesced, maintained, and promoted understaffing to generate greater profits for CoreCivic at the expense of providing reasonable safety for Plaintiff.

150. Defendants CoreCivic, Hininger, Conry, Vantell, and Strada are and may be held liable for acting with deliberate indifference to Plaintiff's safety at the TTCC. Defendants have failed to ensure Plaintiff reasonable personal safety through adequate staffing and following TDOC security protocols in relation to inmates moving from pod to pod and building to building.

151. Defendants CoreCivic, Hininger, Conry, Vantell, and Strada know that Plaintiff faces a substantial risk of serious harm at the TTCC as a result of its chronic understaffing.

152. Defendants CoreCivic, Hininger, Conry, Vantell, and Strada have disregarded known risks to Plaintiff at the TTCC by failing to take reasonable measures to abate them, such as but not limited to, the TDOC assuming partial operations of the TTCC by sending correction officers there to fill *critical posts* until such time as CoreCivic is able to fully staff the TTCC.

153. Defendants CoreCivic, Hininger, Conry, Vantell, and Strada are actually aware of the specific and particularized risk of serious harm posed to inmates in general as a consequence of CoreCivic's deliberate understaffing of the TTCC; CoreCivic's failure to properly train and supervise staff at the the TTCC to ensure adequate staffing levels are met; the TTCC's failure to adhere to safety protocols; and TTCC's failure to classify and house inmates in its care correctly and in accordance with generally accepted practices in prison management.

154. During the time Plaintiff has been housed at the TTCC he has been plagued by constant and pervasive risks of physical harm. Violence and murder are rampant and occur too frequently at the TTCC. Because CoreCivic, Hininger, Conry, and Vantell can not even prevent inmate-on-inmate attacks in the supposed to be safest and most secure unit at the TTCC, to wit, the Alpha Unit, Plaintiff fears that they can not reasonably protect him from inmate-on-inmate attacks and murder anywhere at the TTCC as evinced by the incidents described herein.

155. During the time that Plaintiff has been at the TTCC it has been plagued by longstanding, pervasive, wide spread, well-known, and expressly observed inmate-on-inmate attacks that routinely are not responded to and therefore go unreported to state regulators.

156. To the extent that CoreCivic attempts to segregate violent inmates from non-violent inmates at the TTCC, such attempts are rendered ineffectual by the fact that inmates are misclassified; are not meaningfully secured in their cells; are permitted to freely move from building to building and pod to pod; and entire pods are often left unsecured—even during lock-downs.

157. Despite Defendants CoreCivic's, Hininger's, Conry's, and Vantell's actual knowledge of the severe risks to inmate safety at the TTCC due to understaffing, they have recklessly, callously, consciously, willfully, and deliberately failed to address those risks because deliberate indifference to inmate safety is more profitable. Through their focus on maximizing profits CoreCivic routinely fails to meet constitutionally adequate safety standards at the TTCC resulting in recurring, preventable, and disproportionately high instances of inmate-on-inmate assaults and deaths.

158. Defendants CoreCivic, Hininger, Conry, Vantell, and Strada have actual knowledge, or must be aware, that the TTCC is severely understaffed because they have been exposed to information relating thereto and know the risk of physical harm to Plaintiff and other

43

inmates through reports issued from the Comptrollers office, reports received from Trousdale County by contractual obligation, the TDOC's TTCC Contract Monitor's reports, daily staffing rosters received by Assistant Commissioner of Prisons Lee Dotson from the TTCC,[72] the constant barrage of negative media coverage,[73] the multitude of lawsuits filed regarding CoreCivic, and calls from TTCC inmates' families expressing concern. Moreover, when violent incidents occur correction officials are required to report the same to the TTCC Contract Monitor, the TTCC Warden, and TDOC's Communication Center, who in turn issues a report to the TDOC Commissioner at least quarterly.[74]

159. In an effort to prevent the fact of its chronic, profit-motivated deliberate indifference to inmate safety from reaching Tennessee regulators, legislators, and others, Defendant CoreCivic fails to document, disposes of, takes measures to conceal, swears its employees to silence, and falsifies records and evidence of its deliberate indifference to inmate safety in an effort to avoid legal liability.

160. The *totality of conditions*, practices, and incidents that have occurred, and are occurring at the TTCC are directly attributable to understaffing, such as, violence, lack of recreation, missed educational opportunities, lack of an adequate grievance process, lack of legal and leisure library access, lack of religious services, missed work opportunities, extended lockdowns, lack of programming, etc. These conditions contribute to a dangerous and volatile environment that violates the Eighth Amendment of the United States Constitution.

161. As a result of multiple audits identifying the TTCC's severe understaffing issues and thousands of violent incidents at the facility—both reported and unreported—over a period of years CoreCivic had actual knowledge of the TTCC's chronic understaffing problems and

---

72 2020 Comptroller Report p. 124
73 *See, supra* pp. 4-6 fn. 9
74 2020 Comptroller Report pp. 18-19.

propensity for violence, but it has opted not to staff the TTCC adequately because doing so would have been and is less profitable.

162. CoreCivic has received between $66.46 — $75.48 per day to house Plaintiff in the unconstitutionally operated TTCC. CoreCivic has received money from the TDOC that was allocated to assure Plaintiff was accorded reasonable safety through adequate staffing, but they have failed to do so for the sake of maximizing profits at the expense of providing Plaintiff with reasonable safety.

163. Ultimately, CoreCivic continues to *illegally realize maximum profits* year after year in lieu of providing Plaintiff and other inmates with the services taxpayers are funding, such as, but not limited to, staffing with correctional officers. Because of CoreCivic's insatiable greed all of the services and programs designed to eliminate idleness and promote positive inmate behavior—and thus provide a safer environment for Plaintiff—go to the wayside resulting in a dangerous and volatile prison.

164. Plaintiff's fear of violence perpetrated at the hands of others is directly attributable to Defendant CoreCivic's policy of failing to ensure adequate staffing at the TTCC and its other prison facilities, which was explicitly or impliedly authorized by Hininger, Conry, and/or Vantell and in which they knowingly acquiesced in accordance with CoreCivic's policy of prioritizing profit over inmate safety.

165. Trousdale County, by provision of its lawfully executed contract with the TDOC, promised that any subcontractor it contracted with to operate the TTCC, in this instance CoreCivic, would be required to fulfill all of the requirements set forth in the contract. Trousdale County has failed in its lawful duty to oversee CoreCivic by, *inter alia,* ensuring that it provides adequate staff at the TTCC. Indeed, the fact that it renewed its contract with CoreCivic to operate the prison in May of 2021, despite knowledge of its unconstitutional operation through reports

issued to the TDOC by Trousdale County, demonstrates an acquiescence and tolerance for CoreCivic's policy of understaffing the TTCC. Trousdale County is contractually and lawfully liable for the acts and omissions of CoreCivic.

166. Accordingly, Plaintiff's fear for his current and future safety is also directly attributable to Trousdale County's unlawful failure to oversee and ensure that CoreCivic adequately staffs the TTCC and CoreCivic's failure to do so.

167. Commissioner Strada and TTCC Classification Coordinator Tari Crawford have actual knowledge that CoreCivic, Hininger, Conry, and Vantell can not even prevent inmate-on-inmate attacks and murder in the Alpha Unit at the TTCC or anywhere else at the prison. Defendants Commissioner Strada and TTCC Classification Coordinator Crawford were specifically noticed about Plaintiff's fear for his current and future safety and desire to be moved to a safe TDOC operated prison but they have with deliberate indifference chose to leave Plaintiff at the severely understaffed TTCC with knowledge that it is so.

168. The violations subscribed herein are pursuant to a pattern or practice of resistance to the full enjoyment of Plaintiff's rights protected by the Eighth Amendment. Plaintiff fears for his current and future safety at the TTCC or any CoreCivic operated facility.

## COUNT # 2: TENN. CODE ANN. § 1-3-121 (AS TO DEFENDANTS TROUSDALE COUNTY, AND THE TENNESSEE DEPARTMENT OF CORRECTION)

169. Plaintiff incorporates and re-alleges the foregoing allegations—and claims for relief asserted in Count #1— as if fully set forth herein.

170. Tenn. Code Ann. § 1-3-121 enables Plaintiff to vindicate claims for declaratory and injunctive relief in cases involving illegal and unconstitutional government action. It specifically provides that: "Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action

46

brought regarding the legality or constitutionality of a governmental action."

**171.** Pursuant to Tenn. Code Ann. § 4-6-102 "[t]he management and government of the state penitentiaries for adults are vested in the department of correction." Plaintiff is sentenced to the TDOC's custody to serve a term of incarceration. As a result, the TDOC is Plaintiff's legal custodian and has a duty under state law and the Tennessee Constitution to care for Plaintiff by ensuring that he has provided to him reasonable personal safety, up to and including but not limited to, adequate correction officers to protect him and respond to emergency situations should the need arise. Plaintiff is not required to wait for an assault or emergency that could lead to death before obtaining injunctive relief in relation hereto. *Farmer,* 511 U.S. at 845. It is axiomatic that it would be too late at that point. The TDOC is aware of the correction officer deficiencies and rampant violence at the TTCC through daily staffing rosters received by Assistant Commissioner of Prisons Lee Dotson, audits performed thereof, monthly reports received from Trousdale County, and reports filed by the TDOC's Contract Monitor assigned to the TTCC.

**172.** As an inmate sentenced to the custody of the TDOC Plaintiff fears for his current and future safety if he remains at the TTCC, or if he were to be sent to another chronically understaffed CoreCivic operated facility. Under various provisions of state law Plaintiff is subject to the same. For this reason, and those more fully set forth above, Plaintiff prays that this Court order the TDOC to transfer Plaintiff to one of its facilities, and enjoin the TDOC from housing Plaintiff at a CoreCivic operated prison until such time as they are adequately staffed and safe, and consistently so staffed and safe for a period of time.

**173.** Despite the TDOC's knowledge of the unconstitutional deficiencies at the TTCC they continue to contract with Trousdale County and allow CoreCivic to house inmates that they are responsible for, one of whom is of course Plaintiff.

174. The TDOC has actual knowledge that Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities.

175. Trousdale County, by provision of its lawfully executed contract with the TDOC, promised that any subcontractor it contracted with to operate the TTCC, in this instance CoreCivic, would be required to fulfill all of the requirements set forth in the contract. Trousdale County has failed in its lawful duty to oversee CoreCivic by, *inter alia,* ensuring that it provides adequate staff at the TTCC. Indeed, the fact that it renewed its contract with CoreCivic to operate the prison in May of 2021, despite knowledge of its unconstitutional operation through monthly reports issued to the TDOC by Trousdale County, demonstrates an acquiescence and tolerance for CoreCivic's policy of understaffing the TTCC. Trousdale County is contractually and lawfully liable for the acts and omissions of CoreCivic.

176. Defendant Trousdale County has actual knowledge of the understaffing at the TTCC and the rampant violence resulting from it. Despite this knowledge, Trousdale County continues to contract with CoreCivic to house TDOC inmates at the unconsitutionally operated TTCC. As such, Defendant Trousdale County has acquiesced and tolerated CoreCivic's unconstitutional policy just as though it were its own.

177. Defendant TDOC, Trousdale County, and CoreCivic's chronic deliberate indifference to inmate safety is in direct contravention to the provision of the Eighth Amendment of the United States Constitution against cruel and unusual punishment.

178. Defendant TDOC, Trousdale County, and CoreCivic's actions additionally are in direct contravention to Tennessee Constitution Article I § 32, which provides "[t]hat the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for."

48

179. Absent, at minimum, regular independent monitoring and unannounced inspections designed to determine whether Defendant CoreCivic has remedied its chronic and profit-motivated deliberate indifference to inmate safety and other unlawful conduct as described herein, CoreCivic will—as evinced by their history—continue to act both illegally and unconstitutionally with respect to its operation of the TTCC. To remedy CoreCivic's chronically illegal and unconstitutional actions at the TTCC this Court should appoint an independent monitor to conduct regular unannounced inspections of the TTCC and report whether CoreCivic has remedied its unlawful conduct directly to the Court. The TDOC and Trousdale County are failing to adequately monitor the TTCC.

180. In the absence of CoreCivic coming into compliance with its obligation to ensure a constitutionally adequate level of inmate safety through adequate staffing, this Court should issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate the TTCC going forward, or, order the TDOC to take over operation of the TTCC.

181. The TDOC has a legal duty under the Eighth Amendment of the United States Constitution and Tennessee Constitution Article I § 32, to provide Plaintiff with a reasonably safe prison to serve his term of incarceration. It has failed to do so.

**(THIS SPACE INTENTIONALLY LEFT BLANK.)**

# VI. RELIEF REQUESTED

**WHEREFORE**, Plaintiff requests the following relief:

1. **DECLARE** the TTCC to be operating illegally and unconstitutionally;

2. **GRANT** a preliminary injunction ordering Defendant Commissioner Strada and/or the TDOC to cause Plaintiff to be transferred to a reasonably safe TDOC operated facility;

3. **ENJOIN** the TDOC from housing Plaintiff at a CoreCivic operated facility in the future until they are all fully staffed and deemed safe for a reasonable period of time;

4. **ENJOIN** Trousdale County from continuing to contract with CoreCivic to house inmates at the TTCC in the event that CoreCivic fails to remedy its chronic understaffing;

5. **ASSESS** punitive damages against CoreCivic for its illegal profiting through their knowing, willing, callous, conscious, and reckless failure to provide Plaintiff with reasonable personal safety through adequate staffing in accordance with their lawful duty under the Eighth Amendment of the United States Constitution and Tennessee Constitution Article I § 32;

6. **GRANT** a preliminary injunction **ENJOINING** the TTCC from accepting any new inmates until they are in full compliance with generally accepted standards for prison management and staffing, and TDOC's policies for the same;

7. **GRANT** a preliminary injunction **ORDERING** the TDOC and Commissioner Strada to reduce its inmate population at the TTCC to a level commensurate to the number of certified and posted correction officers that it has to ensure critical posts are filled, and, moving forward, to not send inmates to the TTCC if they do not have sufficient staff;

8. **APPOINT** an independent monitor to audit and ensure that the TTCC maintains compliance with minimal constitutional standards and tax the costs of the same to CoreCivic; and,

9. **GRANT** such other relief as it may appear that Plaintiff is entitled to in

50

accordance with Federal Rules of Civil Procedure 54(c).

***IN THE ALTERNATIVE***, the Court should:

1.    **ENJOIN** the TTCC from continuing to operate moving forward; or,

2.    **ORDER** the TDOC to take control of the TTCC.

## <u>VERIFICATION</u>

I verify that the foregoing is true and correct, except as to matters based on information and belief, and as to those, I believe them to be true. I also verify that the following attached exhibits are true and accurate copies of what they represent.

Executed on this  17th  day of  July,  2023 .

/s  *Chris Adams*

Christopher Adams
328180 TTCC WD 218
140 Macon Way
Hartsville, TN 37074

Sworn to and subscribed before me this
17th day of  July , 2023

W. Grady

Notary Public

My commission expires:  08/27/2025.

STATE
OF
TENNESSEE
NOTARY
PUBLIC
W. M. GRADY
COUNTY OF TROUSDALE

My Comm. Expires
August 27, 2025

51

D STATES
L SERVICE®

RECEIVED

AUG 0 8 2023

U.S. District Court
Middle District of TN

FROM:

**PRIORITY**®
★ MAIL ★

**UNITED STATES**
**POSTAL SERVICE**®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: Christopher B. Adams
#328180 TTCC
140 Mason Way
Hartsville, TN. 37074

TO: CLERK OF COURT
United States District Court
719 Church Street
Nashville, TN. 37203

Label 228, March 2016          FOR DOMESTIC AND INTERNATIONAL USE

---

**UNITED STATES**
**POSTAL SERVICE**®                     Retail

US POSTAGE PAID

**P**          $12.20          Origin: 38652
08/03/23
2755770952-06

PRIORITY MAIL®

3 Lb 15.00 Oz

RDC 01

EXPECTED DELIVERY DAY:  08/05/23

C019

SHIP
TO:      719 CHURCH ST
NASHVILLE TN 37203-7094

USPS TRACKING® #

9505 5142 4216 3215 7724 03

RDC 01

**VISIT US AT USPS.COM**®
ORDER FREE SUPPLIES ONLINE